## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TEXAS
(Sherman Division)

| | |
|---|---|
| Vicki Baker, | Case No.: 4:21-CV-0176-ALM |
| *Plaintiff,* | |
| *v.* | |
| City of McKinney, Texas, | |
| *Defendant.* | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## Oral Argument Requested

### INSTITUTE FOR JUSTICE

Jeffrey Redfern (D.C. Bar No. 1018046)
   *Lead Attorney*
Suranjan Sen (Tenn. Bar No. 038830)
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
Email: jredfern@ij.org; ssen@ij.org

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................i

TABLE OF AUTHORITIES..........................................................................................ii

STATEMENT OF ISSUES TO BE DECIDED ............................................................ 2

STATEMENT OF UNDISPUTED MATERIAL FACTS.............................................. 2

ARGUMENT................................................................................................................. 5

    I.    Ms. Baker is entitled to summary judgment on her Fifth Amendment
        claim. ................................................................................................................. 5

        A.    The Fifth Amendment applies to property that is damaged or
            destroyed, as well as property that is formally appropriated....... 6

        B.    The Fifth Amendment requires compensation when private
            property is intentionally or foreseeably damaged for the public's
            benefit. ................................................................................................. 8

        C.    There is no genuine issue of material fact regarding any of the
            elements of Ms. Baker's Fifth Amendment claim....................... 11

        D.    The Fifth Amendment applies to actions taken under the
            government's "police power."........................................................... 14

    II.    Ms. Baker is entitled to summary judgment on her claim for
        compensation under the Texas Constitution. .......................................... 16

CONCLUSION .......................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Arkansas Game & Fish Comm'n v. United States,*
  568 U.S. 23 (2012) .................................................................7, 8, 9, 14

*City of Dallas v. Stewart,*
  361 S.W.3d 562 (Tex. 2011) ..................................................17

*Hernandez v. City of Lafayette,*
  643 F.2d 1188 (5th Cir. 1981) ...............................................10

*Horne v. Dep't of Agric.,*
  576 U.S. 350 (2015) ................................................................6

*John Corp. v. City of Houston,*
  214 F.3d 573 (5th Cir. 2000) .................................................15

*John Horstmann Co. v. United States,*
  257 U.S. 138 (1921) ................................................................9

*Lech v. Jackson,*
  791 F. App'x 711 (10th Cir. 2019) ........................................15

*Lingle v. Chevron,*
  544 U.S. 528 (2005) ................................................................6

*Loretto v. Teleprompter Manhattan CATV Corp.,*
  458 U.S. 419 (1982) ..............................................................14

*Lucas v. S.C. Coastal Council,*
  505 U.S. 1003 (1992) ............................................................14

*Penn. Coal Co. v. Mahon,*
  260 U.S. 393 (1922) ..........................................................6, 15

*Pumpelly v. Green Bay & Mississippi Canal Co.,*
  80 U.S. 166 (1871) .............................................................6, 7

*Sanguinetti v. United States,*
  264 U.S. 146 (1924) ................................................................8

*Steele v. City of Houston,*
  603 S.W.2d 786 (Tex. 1980) ...................................................................*passim*

*Yawn v. Dorchester County,*
  1 F.4th 191 (2021) ....................................................................... 9, 10, 12, 15

*YMCA v. United States,*
  395 U.S. 85 (1969)...........................................................................8, 11, 14

## Constitutional Provisions

U.S. Const. amend. V ..............................................................................5

Tex. Const. art. I, §17..........................................................................5, 16

## Other Authorities

Maureen E. Brady, *The Damagings Clauses*, 104 Va. L. Rev. 341 (2018)...................7

Last summer, after successfully evading the McKinney police in a car chase, an armed fugitive attempted to hide inside a house owned by Plaintiff Vicki Baker, a totally innocent third party. The fugitive apparently went to Ms. Baker's house because he had previously worked there as a handyman. Ms. Baker's adult daughter was home at the time. Having seen reports that the police were seeking the fugitive, she was frightened when he arrived, so she pretended that nothing was amiss and immediately left the house. She then called her mother, who called the police.

The McKinney police surrounded the house and eventually assaulted it with tear gas grenades, explosives, and an armored vehicle. They discovered the fugitive dead by his own hand, and the property was rendered uninhabitable.

The house had been under contract for sale at the time, but the sale understandably fell through. The cost of the damage was over $50,000, and Ms. Baker, a recent retiree, had to draw on her life's savings to repair the house before she could put it back on the market.

The City of McKinney has refused to compensate Ms. Baker for any of that damage, insisting that its police officers did not act wrongly. But that is irrelevant. The Takings Clauses of the U.S. and Texas Constitutions guarantee Ms. Baker's right to compensation. The City of McKinney destroyed Ms. Baker's home in order to secure a public benefit—apprehending a dangerous fugitive. The cost of securing that benefit must be borne by the public as a whole and not by an innocent and

unlucky homeowner like Ms. Baker. Accordingly, Ms. Baker hereby moves for partial summary judgment on the question of liability.

## STATEMENT OF ISSUES TO BE DECIDED

1. Is Plaintiff Vicki Baker entitled to summary judgment on her claim under the Fifth Amendment to the United States Constitution, on the issue of the City of McKinney's liability for the damage done to her property?

2. Is Plaintiff Vicki Baker entitled to summary judgment on her claim under Article I, Section 17 of the Texas Constitution, on the issue of the City of McKinney's liability for the damage done to her property?

## STATEMENT OF UNDISPUTED MATERIAL FACTS

On July 25, 2020, Plaintiff Vicki Baker's adult daughter, Deanna, read on the internet that a man named Wesley Little had kidnapped a fifteen-year-old girl. Deanna recognized Little as a handyman her mother used to hire for odd jobs at the house, though neither Deanna nor her mother had interacted with him in over a year. Later that day, Deanna was at her mother's house when Little arrived at the door with the teenage girl, saying that he needed to park his car in the garage and stay at the house. Baker Aff. ¶¶ 6, 10.

Out of concern for her safety, Deanna acquiesced and told Little that she was going shopping. Leaving Little (and the girl) at the house, Deanna drove to a local Walmart parking lot and called her mother. Together, they decided to call the McKinney police. Baker Aff. ¶¶ 10–11.

When the police received that call, they were actively searching for Little. Little "was wanted for felony evading, felony endangerment and wanted out of

several surrounding agencies." Redfern Aff., Ex. A (Report of Detective Michelle Read).  Just before arriving at Ms. Baker's house, Little had successfully evaded officers in a car chase.  Redfern Aff., Ex. B (Report of Officer Eric Campbell).  The officers met with Deanna to obtain her garage door opener; then they proceeded to the house so they could apprehend Little. Redfern Aff., Ex. C at 1 (Report of Officer Jesse Vasquez).

Police arrived at the house and set up a perimeter. *Ibid.* A SWAT team arrived with a Bearcat armored vehicle. *Ibid.* After some time, the teenage girl emerged from the house and joined the police, saying that Little was alone inside, armed, and willing to die shooting. *Ibid.*

That was when police formed "[a] gas plan, along with an explosive breach plan . . . to drive [Little] from the attic to the front door, [which] would be opened by the boom of the Bearcat."  Redfern Aff., Ex. D at 1 (Report of Sergeant Christopher Kennedy). "The front door of the home was breached with the RAM of the Bearcat," and police teams "placed an explosive charge on the garage door" and "place[d] ferret [gas] rounds into the ceiling of the garage." *Id.* at 2. After detonating the explosives, one team employed "[s]everal volleys of gas" through the garage ceiling, while another team "utilized a launcher to place gas (ferret rounds) into" various bedroom windows. *Ibid.*

When that plan failed to generate any apparent response from Little, the officers "decided to up the gas plan with tri-chamber CS gas canisters," which "saturate a large structure." *Ibid.* Teams launched the canisters into both the

master bedroom window and the garage ceiling, in an effort "to overwhelm/irritate" Little. *Ibid.* That effort left "the attic[] and most of the house saturated with gas." *Ibid.*

Following the second gas barrage, the "Bearcat team . . . remove[d] the [master bedroom] window" to allow for drone access. *Id.* at 3. The drone "immediately located [Little] . . . on the bed, with a self-inflicted gun shot wou[n]d to the head with a handgun[.]" *Ibid.* Thus, the standoff was over, but—as officers explained to Deanna and Vicki—the house was rendered unlivable. Baker Aff. ¶ 15; Redfern Aff., Ex. E at 14:55–15:00 (explaining that, if Deanna wished to go inside the house, she would need to use a "gas mask").

The City's police records illustrate the severity of the damage to Ms. Baker's home. "During the SWAT call, five windows were damaged in the home[, and t]here was also some damage to the roof as well." Redfern Aff., Ex. F at 1 (Report of Forensic Investigator Ashley Wilson-Byers). One officer "took photographs of all damages on the exterior," as well as "photographs . . . inside the residence to document all damage." *Ibid.* Those photos show the toppled fence and battered front door; the broken windows; the damaged roof and landscaping; the blown-out garage door; and the garage ceiling, attic floor, and dry walls all torn through with gas canisters. *See* Redfern Aff., Ex. G (police photographs). *See also* Baker Aff., Ex. A (photos both before and after the July 25, 2020 incident).

A great deal of the damage cannot be appreciated visually. The explosions left Ms. Baker's dog permanently blind and deaf. The toxic gas that permeated the

house required the services of a HAZMAT remediation team. Appliances and fabrics were irreparable. Ceiling fans, plumbing, floors (hard surfaces as well as carpet), and bricks needed to be replaced—in addition to the windows, blinds, fence, front door, and garage door. Essentially all of the personal property in the house was destroyed, including an antique doll collection left to Ms. Baker by her mother. In total, the damage from the assault alone (*i.e.*, not including cleanup from Little's suicide) was approximately $50,000. Baker Aff. ¶¶ 21–23, 27.

All of that cost has fallen on Ms. Baker's shoulders. The City has refused to pay one penny. *See* Baker Aff., Ex. C. Although her homeowners' insurance did cover damage caused directly by Little (such as cleanup of his body) the policy did not cover damage caused by government—as is typical for homeowners' policies. Baker Aff. ¶¶ 18–20. Although friends and neighbors have pitched in to help as best they can, Ms. Baker—a recent retiree—has had to pay tens of thousands of dollars out of her own pocket (and out of her 401(k)). *See* Baker Aff. ¶ 28.

## ARGUMENT

Ms. Baker is entitled to partial summary judgment on liability, for her claims under the Fifth Amendment to the U.S. Constitution and Article I, Section 17 of the Texas Constitution.

## I.  Ms. Baker is entitled to summary judgment on her Fifth Amendment Claim.

Below, Ms. Baker will demonstrate that the Fifth Amendment applies to property that is damaged as well as appropriated, that the undisputed facts show that Ms. Baker satisfies all of the elements of a claim for property destruction under

the Fifth Amendment, and that the "police power" is not exempt from the Takings
Clause.

### A.   The Fifth Amendment applies to property that is damaged or destroyed, as well as property that is formally appropriated.

"The Takings Clause of the Fifth Amendment, made applicable to the States
through the Fourteenth, provides that private property shall not 'be taken for public
use, without just compensation.'" *Lingle v. Chevron*, 544 U.S. 528, 536 (2005)
(citation omitted). The Takings Clause obviously applies in circumstances where the
government initiates formal condemnation procedures to acquire title to private
property so that it can build, for instance, a road or a school. But the Supreme Court
has long recognized that a wide variety of government actions can interfere with
private property in a manner that "amount[s] to a taking." *Id.* at 537 (internal
quotation marks omitted).

In cases where the government merely restricts an owner's use of her own
property, takings questions can present difficult line-drawing problems regarding
when government regulation goes "too far." *Horne v. Dep't of Agric.*, 576 U.S. 350,
360 (2015) (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). But in
cases where the government intentionally destroys private property, the inquiry is
simple: "[W]here real estate is actually invaded . . . so as to effectually destroy or
impair its usefulness, it is a taking, within the meaning of the Constitution."
*Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. 166, 181 (1871).

In *Pumpelly*, the government had erected a dam that completely flooded the
plaintiff's private property. The government argued that there was no taking

because the government had not used the power of eminent domain and it had the

right to improve navigable rivers. The Supreme Court did not dispute that the state

had the right to erect the dam, but it was a separate question whether

compensation to injured landowners was required. As the Court explained:

> It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use.

*Id.* at 177–78.

Nor is government-caused flooding a special case. Indeed, the Court has

explicitly rejected any " 'flooding-is-different' rule" for government-caused damage

to private property. *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23,

36 (2012).[1]  In short, government-caused damage of private property has long been

encompassed by the Fifth Amendment.

---

[1] Although the United States Constitution lacks an explicit "damagings clause," as appears in the Texas Constitution and those of twenty-six other states, those clauses were adopted primarily to constitutionalize the tort of nuisance and to provide compensation in circumstances where government action devalued land without directly invading it. *See* Maureen E. Brady, *The Damagings Clauses*, 104 Va. L. Rev. 341, 342, 377–78 (2018) (noting that federal precedents already provided for compensation for physical damage at the time that the "damagings clauses" were adopted).

### B.   The Fifth Amendment requires compensation when private property is intentionally or foreseeably damaged for the public's benefit.

The elements of a Fifth Amendment takings claim for property destruction are straightforward: The plaintiff must prove (1) that the property damage or destruction was caused by the government, (2) that the damage was intentional or foreseeable, and (3) that it was for the public benefit. Ms. Baker will address each element in turn below.

*Causation*: Although in many cases, causation will be obvious, it is an element of a Fifth Amendment claim. In *Sanguinetti v. United States*, for instance, the plaintiff argued that the government's construction of a canal had caused his property to be flooded. 264 U.S. 146, 147 (1924).  The Court held that the plaintiff had failed to demonstrate a taking, in part because "the property was subject to seasonal flooding prior to the construction of the canal, and the landowner failed to show a causal connection between the canal and the increased flooding, which may well have been occasioned by changes in weather patterns." *Ark. Game & Fish Comm'n*, 568 U.S. at 34 (citing *Sanguinetti*, 264 U.S. at 149). Similarly, courts have recognized that if the government destroys property that would have been destroyed anyway, the government is not truly the cause of the destruction. *See, e.g., YMCA v. United States*, 395 U.S. 85, 97 (1969) (Harlan, J., concurring) ("[I]f the military reasonably believed that the rioters would have burned the building anyway, recovery should be denied . . . ."); *cf. Steele v. City of Houston*, 603 S.W.2d 786, 789 (Tex. 1980) ("Destruction has been permitted in instances in which the building is . . . in the line of fire and destined to destruction anyway.").

8

*Intentional or Foreseeable*: The Takings Clause imposes liability on the government only for intentional or foreseeable destruction (though statutes may impose additional liability for negligence, subject to various limitations). *See Ark. Game & Fish Comm'n*, 568 U.S. at 39 ("Also relevant to the takings inquiry is the degree to which the invasion is intended or is the foreseeable result of authorized government action.") (citing *John Horstmann Co. v. United States*, 257 U.S. 138, 146 (1921)); *accord Steele*, 603 S.W.2d at 790–92 (no compensation for mere negligence under the Texas constitution).

The Fourth Circuit's recent decision in *Yawn v. Dorchester County*, 1 F.4th 191 (2021), is instructive on this point. The case concerned an aerial mosquito-spraying operation carried out by Dorchester County, South Carolina. The plaintiffs were beekeepers whose bees died shortly after the operation. They claimed that the death of their bees constituted a compensable taking under the Fifth Amendment.

Although the Fourth Circuit agreed that destruction of the bees pursuant to the government's police power to protect the public health could effect a compensable taking,[2] the court rejected this particular claim because "the death of [plaintiffs'] bees was neither intentional nor foreseeable." *Id.* at 195. As the court explained, "the death of [claimants'] bees was plainly unintentional," given the County's "specific measures to avoid the unfortunate death of the bees." *Ibid.*; *see also id.* at 193, 196 (noting that, prior to spraying, "the County issued a press release . . . to numerous media outlets, including local television stations,

---

[2] And thus explicitly rejected the district court's erroneous statement that "[b]ecause [the County] was exercising its police power, and not its power of eminent domain, the Takings Clause is not implicated." *Yawn*, 1 F.4th at 194–95. *See also infra.* Section I(D).

newspapers, radio stations, and social media platforms," and it provided the pilot with a map of all known "beehives so that he could turn off the sprayer when flying over those locations"). Neither was it foreseeable that "the bees would die despite [those] specific efforts to avoid exposing the bees to the pesticide," considering that similar mitigation efforts were successful in the past—though, for an unknown reason, this time the County's warnings did not reach the plaintiffs. *Id*. at 196; *see also ibid*. ("[I]t was not foreseeable that the press release would fail to reach Appellants, leaving Appellants and their bees unprepared for the spray."). There was no reason, under these circumstances, to expect that the spraying operation would lead to the death of any bees, so the court held that there was no taking.

**For the public benefit**: The final element of a Fifth Amendment claim for intentional destruction of private property is that the destruction must be for the public's benefit. Like the element of causation, this will rarely be in dispute because the government will generally contend (as it does here) that it acted on behalf of the public. Indeed, as the Fifth Circuit has recognized, taking private property *without* a valid public use would violate a different constitutional provision—the Due Process Clause—which would also entitle the owner to damages. *See Hernandez v. City of Lafayette*, 643 F.2d 1188, 1200 n.26 (5th Cir. 1981) ("[T]he landowner whose property is . . . 'taken' albeit not for 'public use' will nevertheless have a damage cause of action under s[ection] 1983 since such a 'taking' would constitute the deprivation of property without due process of law under the Fourteenth Amendment.").

There is one recognized circumstance, however, where the intentional destruction of private property is not compensable: The Supreme Court held in *YMCA v. United States* that no compensation is due where the property owner is the "particular intended beneficiary" of the government's action. 395 U.S. at 92. In *YMCA*, American troops occupied a YMCA building in the Panama Canal Zone, in order to protect the building from rioters who were attacking the building with Molotov cocktails. The YMCA sued the United States, claiming a right to compensation under the Fifth Amendment for damage done to the building by the rioters. The YMCA had argued that troops had occupied the building "not for the purpose of protecting those buildings but as part of a general defense of the [Panama Canal] Zone as a whole." *Id.* at 90. The Court rejected that argument, as the record demonstrated that the primary reason the troops entered the building was to protect it specifically, and not as part of some larger operation. While acknowledging that "any protection of private property also serves a broader public purpose," *id.* at 92, the Court held that the broader purpose of this military operation was merely incidental to the specific objective of aiding the property owner. Justice Stewart, concurring, emphasized that if the military had used the property for its own purposes, however, there would have been a taking. *Id.* at 94. One can easily imagine analogous but more mundane situations that would also not constitute a taking under this reasoning (*e.g.,* it would likely not be a taking if a paramedic breaks down a door to reach a property owner who has taken a bad fall and is unable to get up).

**C.      There is no genuine dispute of material fact regarding any of the elements of Ms. Baker's Fifth Amendment claim.**

It is beyond dispute that the City's officers intentionally and foreseeably caused significant damage to Ms. Baker's home in exchange for obtaining a public benefit. The City's officers did not damage Ms. Baker's house by accident. In the words of Sergeant Christopher Kennedy, the City's officers executed "[a] gas plan, along with an explosive breach plan . . . to drive [Little] from the attic to the front door, [which] would be opened by the boom of the Bearcat." Redfern Aff., Ex. D at 1. An immediate, necessary, and intended consequence of that assault was to leave "most of the house saturated with [tear] gas." *Id.* at 2. Indeed, if for some reason the house did not sustain damage—if, hypothetically, the windows proved unbreakable or the gas canisters did not activate—then the officers' plan necessarily would have failed.

Even if the damage were not intentional—and it clearly was—it is at the very least foreseeable. Any reasonable person must recognize that detonating "an explosive charge on [a] garage door" will damage the garage door, or that "utiliz[ing] a launcher to place gas" through windows will damage the windows. *Ibid.* This is not a case of some unusual, attenuated, distant, or freak circumstance. *Compare with Yawn*, 1 F.4th at 196 (describing claimants' loss of bees as "a clear outlier," considering that the spray "did not kill other local beekeepers' bees").

That is not to suggest that the officers inflicted damage for damage's sake. Instead, as the City's documents demonstrate, the point of the assault was to apprehend Little by forcing him to leave the house. *See* Redfern Aff., Ex. D at 1

(describing the "plan" as aiming "to drive [Little] from the attic to the front door, [which] would be opened by the boom of the Bearcat"). The officers blew up the garage door so that they could "place ferret [gas] rounds into the ceiling of the garage," which, when combined with canisters launched through the windows, would leave "most of the house saturated with gas." *Id.* at 2. The ultimate goal of that assault was "to overwhelm/irritate" Little so that he would "come out" and submit to the officers' custody. *Ibid.*

Apprehending Little was undeniably for the public's benefit. As indicated in the City's documents, Little "was wanted for felony evading, felony endangerment and wanted out of several surrounding agencies." Redfern Aff., Ex. A. "[W]ithin the hour, [Little had] just evaded police in a pursuit" at the time that Ms. Baker called the police.  Redfern Aff., Ex. D at 1; s*ee also* Redfern Aff., Ex. B. The very reason that Ms. Baker called the police was because she thought that the police wanted custody of Little.  *See* Baker Aff. ¶¶ 6, 10–11; *see also* Redfern Aff., Ex. E at 15:37– 15:54 (officer telling Deanna that "you did good by going away from here and contacting us by letting us know that [Little and the girl were] here"). And indeed, officers were actively searching for Little the moment they received Ms. Baker's call. Redfern Aff., Ex. B ("While waiting for [Officer Campbell's] video [of the car pursuit] to download, it was learned that Wesley Little had arrived at 3600 Vista Verde Dr. in McKinney, TX via phone call from resident Vicky [sic] Baker.").

It was obtaining that public benefit—and not providing any unique benefit to Ms. Baker—that drove the officers' actions. The assault was not to save Ms. Baker

or Deanna, or anyone at all: By the time the officers executed their plan, the teenaged girl had safely escaped into police custody, and the officers knew that Little was alone in the house. *See* Redfern Aff., Ex. C at 1. Neither was the assault to help Ms. Baker as a property owner, given that the catastrophic damage the officers inflicted on the house (1) dwarfed any damage that Little was inflicting directly and (2) greatly outweighed any value from temporary loss of the property's use until Little inevitably would leave. *See id*., Ex. D at 1–2 (noting that police "shut off gas to the home" and set up a perimeter around it). This is not a case where the destruction of Ms. Baker's home was an inevitability, or where greater harm would have befallen Ms. Baker absent the officer's assault. *Compare with YMCA*, 395 U.S. at 92 ("The YMCA building was on fire from Molotov cocktails being thrown from [rioters]." (internal quotation marks omitted)). Instead, the goal was to apprehend a dangerous fugitive: a laudable goal, but one for the *public's* benefit and "which, in all fairness and justice, should be borne by the public as a whole" and not for Ms. Baker "alone to bear." *Ark. Game & Fish Comm'n*, 568 U.S. at 31 (citation omitted).

## D. The Fifth Amendment applies to actions taken under the government's "police power."

In its pending motion to dismiss, the City strenuously argued that exercises of the "police power" are categorically exempt from the Fifth Amendment's Takings Clause. (ECF No. 6, at 7–8.) In her opposition, Ms. Baker explained why that is incorrect, and she expressly readopts those arguments in this motion. (ECF No. 9, at 5–12.) She will not restate all of those arguments here, but in brief, both the Supreme Court and the Fifth Circuit have repeatedly rejected any claim that the

14

government's police power is exempt from the Takings Clause. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1026 (1992) (noting that "our cases provide no support" for an approach that would "essentially nullify . . . limits to the noncompensable exercise of the police power"); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982) (holding that a given governmental act might be "within the State's police power" but that "[i]t is a separate question . . . whether an otherwise valid [exercise of the police power] so frustrates property rights that compensation must be paid"); *John Corp. v. City of Houston*, 214 F.3d 573, 578–579 (5th Cir. 2000) ("[A] distinction between the use of police powers and of eminent domain power, however, cannot carry the day. . . .[S]imply because the City did not formally use its powers of eminent domain to destroy Appellants' property does not mean that its actions could not amount to a taking requiring just compensation."). And the Fourth Circuit has, just this summer, likewise rejected the City's argument. *Yawn*, 1 F.4th at 195 ("That Government actions taken pursuant to the police power are not per se exempt from the Takings Clause is axiomatic in the Supreme Court's jurisprudence.").

To be sure, a Tenth Circuit panel has followed the City's argument, albeit in an unpublished decision. *Lech v. Jackson*, 791 F. App'x 711, 717 (10th Cir. 2019). Ms. Baker acknowledges that if *Lech* were controlling here, she would lose this case. But *Lech* is not controlling. Moreover, it is simply inconsistent with a century of Supreme Court precedent. *See, e.g., Penn. Coal Co.*, 260 U.S. at 415. This Court should disregard *Lech* and follow the overwhelming binding authority from the

Supreme Court and the Fifth Circuit, as well as the persuasive authority of the Fourth Circuit's recent decision.

## II.    Ms. Baker is entitled to summary judgment on her claim for compensation under the Texas Constitution.

The Texas Constitution contains its own Takings Clause, which provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made." Tex. Const. art. I, §17. The Texas Supreme Court has interpreted this provision to apply in a situation materially identical to Ms. Baker's. *See Steele v. City of Houston*, 603 S.W.2d 786 (1980). Ms. Baker is entitled to compensation for the same reasons that the property owners in *Steele* were entitled to compensation.

In *Steele*, escaped prisoners barricaded themselves inside the home of an innocent third party. The police surrounded the house and ultimately sought to drive the fugitives out by launching incendiary devices into the house and allowing the house to burn. The Texas Supreme Court, while explicitly noting that it did "not hold that the police officers wrongfully ordered the destruction of the dwelling," nevertheless held "that [] innocent third parties are entitled by the Constitution to compensation for their property." *Id.* at 793. Thus, the plaintiffs had stated a viable claim for relief, which they would be entitled to receive should they "make proof that the City of Houston, acting through its officers with authority or color of authority, intentionally set the house on fire or that the City prevented the fire's extinguishment after it was set[,and] that the destruction was done for or applied to public use," which may "be established by proof that the City ordered the

16

destruction of the property because of real or supposed public emergency to apprehend armed and dangerous men who had taken refuge in the house." *Id.* at 791–792 (internal quotation marks omitted).[3]

The undisputed material facts in this case easily satisfy the elements of a Texas takings claim, as articulated by the Texas Supreme Court in *Steele*. First, the City's disclosures prove that the damage to Ms. Baker's home was intentional. The City's officers coordinated a planned assault on the house: "A gas plan, along with an explosive breach plan was put into place[.]" Redfern Aff., Ex. D at 1. As part of that plan, the officers deliberately detonated explosives on the garage door, toppled the fence and front door with an armored vehicle, and launched gas canisters through windows and the garage ceiling so that "most of the house [would be] saturated with gas." *Id* at 2.

Second, the City's disclosures demonstrate that "the destruction of the property [was] because of real or supposed public emergency to apprehend [an] armed and dangerous [man] who had taken refuge in the house." *Steele*, 603 S.W.2d at 792. Little was wanted for a variety of criminal allegations, and police had already tried and failed to apprehend him in a car chase that occurred less than an hour before Ms. Baker's call. *See* Redfern Aff., Ex. B; *see also* Redfern Aff., Ex. D at 1. When the officers decided to execute their planned assault on Ms. Baker's house,

---

[3] In its Reply in Support of its pending Motion to Dismiss, the City—unable to articulate any meaningful distinction between this case and *Steele*—suggests that *Steele* is no longer good law in Texas. *See* ECF No. 10, at 10 ("[G]iven the approximately forty years since *Steele* was decided, Baker cites no subsequent state case with facts similar to Baker's that relies upon *Steele*."). Of course, the City fails to provide any case suggesting that *Steele* has been overruled or abrogated. But more importantly, the Texas Supreme Court within the last decade explicitly outlined *Steele*'s facts and affirmed that it provides the fundamental framework for Takings suits in the state. *See City of Dallas v. Stewart*, 361 S.W.3d 562, 568 (Tex. 2011).

Little was known to be alone, to have "multiple weapons," and to be "ready to die and [] go out shooting." *Ibid*. Thus, the officers utilized their explosives, gas canisters, and armored vehicle in a manner designed "to drive [Little] from the attic to the front door" and into the police perimeter for apprehension. *Ibid*; *see also* Redfern Aff., Ex. F at 1 ("SWAT deployed several types of projectiles as well as gas canisters *in order to force Mr. Little out of the location*[.]" (emphasis added)).

Again, this is not to suggest that the City's officers acted *wrongly*. Apprehending an "armed and dangerous" man is an important public benefit. But, like its federal counterpart, the Texas Constitution requires that the public as a whole—not Ms. Baker alone—pay for the cost of securing that public benefit. *See Steele*, 603 S.W.2d at 793 ("We do not hold that the police officers wrongfully ordered the destruction of the dwelling; we hold that the innocent third parties are entitled by the Constitution to compensation for their property.").

## CONCLUSION

This Court should grant Plaintiff Vicki Baker's Motion for Partial Summary Judgment and hold that, under the United States and Texas Constitutions, the City of McKinney is liable for the damage it caused to her house in the process of apprehending a dangerous criminal.

DATED: September 20, 2021          Respectfully Submitted:

/s/ Jeffrey Redfern
Jeffrey Redfern (D.C. Bar No. 1018046)
  *Lead Attorney*
Suranjan Sen (Tenn. Bar No. 038830)
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
Email: jredfern@ij.org; ssen@ij.org

*Attorneys for Plaintiff*