UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
(Sherman Division)

| | |
|---|---|
| Vicki Baker, *Plaintiff*, v. City of McKinney, Texas, *Defendant*. | Case No.: 4:21-CV-0176-ALM |

**AFFIDAVIT OF VICKI BAKER**

Pursuant to 28 U.S.C. § 1746(2), I, Vicki Baker, declare under penalty of perjury that the foregoing is true and correct:

1. I am a citizen of the United States over eighteen years of age. I am of sound mind and fully competent to make this affidavit, which I knowingly and voluntarily make based on my personal knowledge.

2. I am now a resident of Montana.

3. In 2007, I purchased a house and property (the house) located at 3600 Vista Verde Trail, McKinney, TX 75070, where I lived for the next thirteen years before I retired and moved to Montana.

4. By that time, I had fully paid the mortgage for the house and decided to put it up for sale.

5. My adult daughter, Deanna Cook, helped me by preparing the house for sale in the summer of 2020. As of July 25, 2020, I had found a buyer and the house was in the closing stages of sale.

6. That morning, Deanna called me saying that she read on the internet that people were looking for Wesley Little, who had run off with a teenage girl.

7. I had known Mr. Little as a handyman I hired in 2018 to fix some things around the house. After my children told me that he made inappropriate comments to them, however, I asked him not to return to the house.

8. As of July 25, 2020, it had been more than a year since any of us heard anything of Mr. Little.

9. Later that afternoon, I was on the phone again with Deanna when she said she needed to hang up because someone was at the front door.

10. Deanna called me back right away to say that the person at the door was Mr. Little (who had a girl with him). Deanna said that Mr. Little wanted to leave his car in the garage and stay at the house. Deanna was scared, so she let Mr. Little into the house and left immediately to call me from a nearby Walmart parking lot.

11. I then called the City of McKinney police to tell them that Mr. Little was at our house, with the girl.

12. The police told me that Deanna should wait where she was and that they'd come quickly.

13. Some time later, the police told me over the phone that the girl had left the house, and that they had the house surrounded with Mr. Little alone inside.

14. That night, police told me over the phone that Mr. Little had killed himself by a shot to the head in the master bedroom.

15. Police also told me that they had used force to get inside the house, and that it was unsafe to be inside the house because of teargas that they used.

16. The buyer backed out of the sale, which was understandable considering the extent of the damage.

17. A true and correct copy of photographs taken before the incident (when I placed the house for sale on the market) and immediately after the incident is attached as Exhibit A.

18. My insurance agent was nice and did everything she could to help. She was able to help me replace anything that Mr. Little had used or damaged— towels (he took a bath), bedding (he shot himself on the bed), the ceiling fan in the bedroom (hit by the bullet from Mr. Little's gun), etc. She also helped me get reimbursement for the cleanup of Mr. Little's body, which left matter all over the bedroom and blood that seeped through the floor all the way into the foundation (both in the bedroom and through the hallway and kitchen where his body was dragged out).

19. My insurance (State Farm) would not cover any damage caused by the City's police, including the structural damage to the outside of the property as well as damage to the inside from the gas canisters.

20. A true and correct copy of the letter from my insurance company denying coverage for acts of government is attached as Exhibit B.

21. Physical damage from the police's vehicle, explosions, and gas canisters included the destruction of six windows and blinds, a new front door, the wooden fence, various ceiling fans, and the garage door. Additionally, holes in the walls, roof, and ceilings needed to be patched and painted, bricks and bushes needed to be replaced, and multiple interior doors were damaged. My dog was left permanently blind and deaf.

22. Damage from the gas was even worse. A HAZMAT team had to clean up the house just so that it would be safe to enter. The gas touched every surface in the house, meaning that carpets and flooring had to be replaced.

23. The gas remediation team also had to throw away all of my personal possessions, which included appliances, furniture, a book collection, and an antique doll collection left to me by my mother.

24. Two weeks after the incident, I filled out a claim with the City of McKinney for property damage. I then received a letter saying that the City would not pay for any of the damage to my house.

25. A true and correct copy of the City's letter to me is attached as Exhibit C.

26. I eventually found a new buyer, but only after completing repairs to the house.

27. I have estimated the cost of repairing the damage to the house and loss of personal property from the police's vehicle, canisters, and gas to be at least fifty thousand dollars.

28. Even with the help of friends and family, I have had to pay tens of thousands of dollars out of my life's savings and 401(k).

Executed on this __16th__ day of September, 2021

*Vicki Baker*
Vicki Baker