# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

VICKI BAKER,  
    *Plaintiff*,

v.

CITY OF MCKINNEY, TEXAS,  
    *Defendant*.

§  
§  
§  
§  
§  
§  
§  
§  
§

Civil Action No.  4:21-CV-00176  
Judge Mazzant

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff Vicki Baker's Motion for Partial Summary Judgment (Dkt. #19).  Having considered the motion and the relevant pleadings, the Court finds that Plaintiff's motion should be **GRANTED**.

## BACKGROUND

On July 25, 2020, the City of McKinney Police Department (the "Department") destroyed Vicki Baker's ("Baker") home during a standoff with an armed fugitive.  When Baker sought compensation for the destruction of her private property, the City refused to pay.  This lawsuit followed.

Baker was a long-time resident of McKinney, Texas when she made plans to sell her house and retire.  She had already moved to Montana when she contracted with buyers to sell her McKinney home (the "House").  In Baker's absence, her daughter, Deanna Cook ("Cook"), was staying in the House to prepare it for final sale.  On the morning of July 25, 2020, Cook learned that a man named Wesley Little ("Little") had kidnapped a fifteen-year-old girl and evaded Department officers.  Cook recognized Little because he had previously performed odd jobs for Baker around the House.

Later that same day, Little arrived at Baker's front door with the fifteen-year-old hostage in tow.  Little asked to hide out in the House and requested to hide his car in the garage.  Cook acquiesced but, in a ploy to escape the House, convinced Little to allow her to go the grocery store. In the parking lot of a local Walmart, Cook called Baker, and together, the two called the McKinney police to report the situation.  When Department officers arrived at Cook's location, Cook provided the officers with the code to enter the House and the garage door opener. Department officers then went to the House where Little remained in hiding with the teenage girl.

Upon arrival, Department officers surrounded the House and attempted to negotiate with Little.  Little released the fifteen-year-old girl unharmed, but the girl informed Department officers that Little possessed multiple firearms and that he refused to leave the House alive.  Following hours of unsuccessful negotiations, Department officers attempted to draw Little out of the House through several forceful tactics, including the use of tear gas.  Despite the Department's efforts, Little would not leave the House.  Department officers then forcefully entered the home by breaking down both the front and garage door and running over the backyard fence with a tank-like vehicle known as a BearCat.  Upon entry, Department officers found Little had taken his own life.

Department officers documented the damage to Baker's home in their police records.  One officer documented the damage through photographs, which show "the toppled fence and battered front door; the broken windows; the damaged roof and landscaping; the blown-out garage door; and the garage ceiling, attic floor, and dry walls all torn through with gas canisters" (Dkt. #19 at p. 4).  Much of the damage went beyond what could be captured visually:

> The explosions left [] Baker's dog permanently blind and deaf. The toxic gas that permeated the [H]ouse required the services of a HAZMAT remediation team. Appliances and fabrics were irreparable. Ceiling fans, plumbing, floors (hard surfaces as well as carpet), and bricks needed to be replaced—in addition to the

2

windows, blinds, fence, front door, and garage door. Essentially all of the personal property in the [H]ouse was destroyed, including an antique doll collection left to [] Baker by her mother. In total, the damage . . . was approximately $50,000.

(Dkt. #19 at pp. 4–5).   The prospective homebuyers backed out of the sale.   As is typical for homeowners' policies, because the Department is a government entity and caused the damage, insurance denied the claim.[1]

Two weeks later, Baker filed a claim for property damage with the City of McKinney (the "City").   The City replied in a letter that it was denying the claim in its entirety because "the officers have immunity while in the course and scope of their job duties" (Dkt. #19-4 at p. 2).

On March 3, 2021, Baker filed suit against the City for violations of the takings clauses of both the United States and Texas Constitutions.   Baker alleges that extensive damage to her House resulted from the Department's standoff with Little. Specifically, Baker claims that: (1) every window needed replacing; (2) a hazmat remediation team had to clean the House due to the tear gas; (3) various appliances were destroyed; (4) the front and garage door needed replacing (5) tear gas cannisters had destroyed parts of the drywall; and (6) carpets, blinds, and ceiling fans needed replacing.

On November 11, 2021, the Court denied the City's Motion to Dismiss (Dkt. #23).   On September 20, 2021, Baker filed the present motion (Dkt. #19), and on October 12, 2021, the City responded (Dkt. #20).   On October 19, 2021, Baker replied (Dkt. #21).   The City filed a sur-reply on October 25, 2021 (Dkt. #22).   On December 3, 2022, the City filed its Answer (Dkt. #25).   On December 6, 2021, the Court referred this case to mediation (as is standard) (Dkt. #26), but on February 22, 2022, Baker filed a notice with the Court that the parties had not reached an agreement (Dkt. #28).   The City followed Baker's notice with a demand for trial by jury (Dkt. #29)

---

[1] Homeowner's insurance did cover the cost of damages caused directly by Little—specifically, the cleanup of his body.  The $50,000 in alleged damages does not include the cost of this cleanup.

3

and an opposed motion to reopen discovery (Dkt. #30).  This case is set for trial by jury to begin on May 11, 2022.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment."  *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.  FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure all of the essential elements of the claim or defense."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Baker asserts she is entitled to summary judgment on both her Fifth Amendment and Texas state law takings claims. The Court will address the merits of both claims but will first dispose of the procedural arguments the City raised in its response.

### I.      The City's Procedural Arguments

First, the City argues Baker's filing is a non-dispositive motion in excess of fifteen pages and, therefore, in violation of Local Rule 7(a)(1). Baker concedes that she violated Local Rule 7(a)(1) when she filed a 19-page partial motion for summary judgment, which this Court considers a non-dispositive motion. *See* E. D. TEX. CIV. R. 7(a)(2) ("Non-dispositive motions include, among others, motions to transfer venue, motions for partial summary judgment, and motions for new trial pursuant to Fed. R. Civ. P. 59."). But as Baker points out, "courts in this district rarely strike briefing solely for exceeding page limitations—particularly in cases of good faith" (Dkt. #21

at p. 5 (citing *Ocwen Loan Servicing, LLC v. Heiberg*, No. 4:17-CV-690, 2020 WL 949207, at *4 (E.D. Tex. Feb. 4, 2020); *Vanderbol v. State Farm Mut. Auto Ins. Co.*, No. 4:19-CV-119, 2019 WL 6117355, at *1 n.1 (E.D. Tex. Nov. 18, 2019); *United States v. Cramer*, No. 1:16-CR-26, 2018 WL 7821138, at *1 (E.D. Tex. June 6, 2018); *S.H. ex rel. A.H. v. Plano Indep. Sch. Dist.*, No. 4:08-CV-96, 2010 WL 1375177, at *2 (E.D. Tex. Mar. 31, 2010); *Mettler-Toledo, Inc. v. Fairbanks Scales, Inc.*, No. 9:06-CV-97, 2009 WL 10677858, at *2 (E.D. Tex. Jan. 5, 2009)). Baker's counsel originally intended to file a dispositive motion for summary judgment and later amended it because there were factual disputes regarding damages (Dkt. #21 at p. 5 n.1). Counsel admits he did not realize that partial and dispositive motions have different page limits under this Court's local rules (Dkt. #21 at p. 1 n.1). Accordingly, such error was not made in bad faith, which is further indicated by the small excess—only four pages—over the limit. The Court will not strike the motion and will consider it in its entirety.

Second, the City argues the Court may not consider portions of Baker's affidavit or an attachment to the affidavit of Baker's counsel, Jeffrey Redfern ("Redfern") because they contain hearsay statements that do not fall within any exception. The attachment to Redfern's affidavit that the City complains of is an audio recording made by Cook on July 25, 2020, marked as Exhibit E because the Department's own records supply the same information. Thus, the Court need not, and will not, consider Exhibit E in determining its ruling on this motion. Similarly, the portions of Baker's affidavit that the City objects to simply represent Baker's understanding of what happened July 25, 2020, as relayed to her by Department officers. Again, the Court need not even consider Baker's affidavits because the Department's own records supply the same information. Moreover, none of the facts that may give rise to a takings claim appear to be in dispute.

Finally, the City requests the Court either defer considering the current motion, deny the

motion, or allow the City time to take discovery.  As an initial matter, the Court will consider this request for additional discovery under Federal Rule of Civil Procedure 56(d), which permits the Court to defer consideration of the present motion, deny the present motion, allow time for discovery, or issue any other appropriate order—but only "[i]f [the] nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." FED. R. CIV. P. 56(d).  That said, the Court denies the City's request.

Pursuant to the Court's Scheduling Order, discovery was set to close on November 29, 2021 (Dkt. #18).  However, the City filed its motion to dismiss for lack of jurisdiction and failure to state a claim on April 14, 2021 (Dkt. #6).  While waiting for the Court's order, the City failed to take depositions, request necessary documents, seek an extension of the discovery window or seek modification of the Court's Scheduling, or request a stay pending resolution of the Motion to Dismiss.  As such, on November 18, 2021, when the Court issued its Order denying the City's motion (Dkt. #23), the City had conducted little to no discovery.  While the Court acknowledges there were only eleven days left in the discovery period at the time it entered its Order on the motion to dismiss, the City could have requested an extension.  But it did not.  Ultimately, the City dragged its feet on engaging in the discovery process, thereby failing to collect evidence to support its defenses.  The City's own failure to conduct discovery is no reason to deny the partial summary judgment or decline to consider it on the merits.

Even if the Court reopened discovery, it would be futile for the purposes of the current motion.  In his affidavit, Defendant's counsel Edwin Voss ("Voss") asserts that conducting further discovery would allow the City to determine factual details regarding: Baker's request for police assistance during the underlying events; "other matters related to the issues of consent and intent"; the relationship among Little, Baker, and Cook; the value of the House; and "financial

7

contributions and other offsets [Baker] may have received from any organizations, insurance companies, friends, family, and other sources" (Dkt. #20-1 at p. 2).  For the reasons given below, additional discovery on these points would change nothing about the Court's analysis or conclusions.

First, Baker's motion only seeks a ruling to the City's liability.  The Court, therefore, need not consider the value of Baker's property or any offset she may have received following the destruction of her home.  Second, issues of consent are irrelevant to Baker's claims regarding the City's liability.  "Baker claims that a taking occurred not from the police's entry into her home but, instead, from their destruction of it" (Dkt. #21 at p. 7).  That a person consents to the police's entry into her home does not equate to her consent that the police destroy it.  *Cf. Palacios Seafood, Inc. v. Piling, Inc.*, 888 F.2d 1509, 1515 (5th Cir. 1989) (finding "that the plaintiff consented to the governmental activity that proximately caused injury" because the plaintiff lobbied for a restoration project and then "declined the [government's] offer to stop construction when damage first appeared").  Third, the City provides no reason as to why the relationship among Baker, Cook, and Little is relevant to the Court's determination of liability.

The City has, therefore, not shown that the facts it seeks to establish in further discovery are essential to justify its opposition to this motion.  For these reasons, the Court will deny the City's request and turn to the merits of Baker's motion.

## II.    Fifth Amendment Claim

Baker argues she is entitled to summary judgment on her claim under the Fifth Amendment to the United States Constitution because the City intentionally caused damage to her property in its pursuit of an armed fugitive and denied her compensation for that damage.[2]  Specifically, Baker

---

[2] Baker brings a federal takings claim under the Just Compensation Clause of the Fifth Amendment to the United States Constitution, made binding on the States through the Fourteenth Amendment.  *See San Diego Gas & Elec. Co.*

contends the Fifth Amendment: (1) "applies to property that is damaged or destroyed, as well as property that is formally appropriated" (Dkt. #19 at p. 6); (2) "requires compensation when private property is intentionally or foreseeably damaged for the public's benefit" (Dkt. #19 at p. 8); and (3) "applies to actions taken under the government's 'police power'" (Dkt. #19 at p. 14).  The City, incorporating the arguments set forth in its Motion to Dismiss (Dkt. #6),[3] argues Baker cannot establish a substantive Fifth Amendment takings clause violation because "a legitimate exercise of the City's police power through the operations of its police department . . . does not constitute a taking under the Fifth Amendment" (Dkt. #20 at p. 8).[4]

The City asks this Court to adopt what would constitute a *per se* rule: destruction to private property resulting from the exercise of valid police power cannot constitute a Fifth Amendment taking under any circumstance.  Baker does not contest that the Department's actions were valid exercises of the State's police power.  Instead, Baker posits that a taking may occur in situations other than through the traditional eminent domain power.  Thus, in this case, liability under the Fifth Amendment turns on a purely legal issue: whether a taking can occur where the government's destruction of property was done pursuant to a valid exercise of its police power.  If the Court answers in the affirmative, it must then determine whether a taking occurred when the Department officers destroyed the House.

### A. Whether Destruction Resulting From Exercises of Police Power is Categorically Non-Compensable Under the Fifth Amendment

Police powers are the fundamental ability of a government to enact laws in the public

---

*v. City of San Diego*, 450 U.S. 621, 623 n.1 (1981) ("The Fifth Amendment's prohibition applies against the States through the Fourteenth Amendment.").

[3] For this reason, the Court will refer to portions of the arguments set forth in the City's Motion to Dismiss, even though that motion has been resolved.

[4] The City also argues Baker cannot establish municipality liability under § 1983 (Dkt. #20 at p. 8).  However, because such argument is not responsive to Baker's arguments, the Court will address and dispose of this point later in its analysis.

interest, although the term eludes an exact definition.  *See Berman v.* Parker, 348 U.S. 26, 32 (1954) ("An attempt to define its reach or trace its outer limits is fruitless[.]").  That said, "[p]ublic safety, public health, morality, peace and quiet, law and order . . . are some of the more conspicuous examples of the traditional application of the police power."  *Id.*  Here, there is no dispute that the invasion onto Baker's private property in order to apprehend Little and save his hostage was a legitimate exercise of the City's police power.  However, the parties disagree on the effect—namely, whether the City's exercise of its police power bars Baker's takings claim.  On the one hand, the City contends that because the officers destroyed the House pursuant to the police power, it is categorically exempt from the Takings Clause.  On the other hand, Baker argues the City is not exempt from the Takings Clause—the police power and eminent domain powers may co-exist.  Neither the Supreme Court nor the Fifth Circuit have squarely decided one way or another.  Thus, the Court will undertake its own analysis to determine what outcome best aligns with the Supreme Court's Takings Clause jurisprudence.

### 1.  Supreme Court Takings Clause Jurisprudence

The Fifth Amendment to the United States Constitution prohibits the government from taking private property for public use without just compensation, pursuant to the Takings Clause. U.S. CONST. amend. V ("[N]or shall private property be taken for public use, without just compensation.").  The guarantee of the Takings Clause was designed to bar the United States from forcing some people alone to bear public burdens that, in all fairness and justice, should be borne by the public as a whole.  *Armstrong v. United States*, 364 U.S. 40 (1960).

The Supreme Court has stated that a taking, within the meaning of the Takings Clause, includes any action the effect of which is to deprive the owner of all or most of his or her interest in the subject matter, such as destroying or damaging it.  *U.S. v. Gen. Motors Corp.*, 323 U.S. 373

(1945).  More specifically, "a property owner has suffered a violation of [her] Fifth Amendment rights when the government takes [her] property without paying for it."  *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2167 (2019).

A taking in violation of the Fifth Amendment may come in two forms—physical or regulatory.  *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002) ("The text of the Fifth Amendment itself provides a basis for drawing a distinction between physical takings and regulatory takings.").  A physical taking is a "direct government appropriation or physical invasion of private property."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner.  *Tahoe-Sierra*, 535 U.S. at 323 (quoting *United States v. Pewee Coal Co.,* 341 U.S. 114, 115 (1951)).  A regulatory taking generally occurs where a state regulation "denies an owner economically viable use of his land." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987).  The type of taking alleged is also an often-critical factor, as it is well settled that a "'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government."  *United States v. Causby*, 328 U.S. 256 (1946).  These principles of law are fundamental in the Supreme Court's Takings Clause jurisprudence.  *Ark. Game and Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012).   Indeed, the Supreme Court's physical takings jurisprudence is "as old as the Republic."  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citing *Tahoe-Sierra*, 535 U.S. at 322).

While most takings claims turn on situation-specific factual inquiries, *see Penn Cent. Transp. Co. v. N.Y.C.*, 438 U.S. 104, 124 (1978), the Supreme Court has drawn a handful of brightline rules. *Ark & Game,* 568 U.S. at 24.  Relevant here, even a minimal "permanent physical

11

occupation of real property" requires compensation under the Takings Clause. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 427 (1982).  "When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point*, 141 S. Ct. at 2071 (citing *Tahoe-Sierra*, 535 U.S. at 321).  Examples of physical takings include formally condemning a property through the power of eminent domain, taking possession of property without acquiring title, or even by recurrent flooding as a result of building a dam. *Gen. Motors*, 323 U.S. at 374–75; *United Sates v. Pewee Coal Co.*, 341 U.S. 114, 115–17 (1951); *United States v. Cress*, 243 U.S. 316, 328 (1917).  These sorts of physical appropriations constitute the "clearest sort of taking." *Palazzolo v. Rhode Island*, 533 U. S. 606, 617 (2001).  As such, the Supreme Court "assess them using a simple, *per se* rule: The government must pay for what it takes." *Cedar Point*, 141 S. Ct. at 2071 (citing *Tahoe-Sierra*, 535 U. S. at 322).

Ignoring this jurisprudence, the City asks the Court to adopt a new brightline rule: destruction resulting from a legitimate exercise of the City's police power does not constitute a taking under the Fifth Amendment (Dkt. #20 at p. 8).  However, the Court need not adopt a brand-new *per se* rule when the Supreme Court has already stated, in no uncertain terms, that in the case of a physical taking, the government must pay for what it takes.  *See Cedar Point*, 141 S. Ct. at 2071.

### 2. *Lech v. Jackson*

The City relies on decisions from other circuits that have wholly banned recovery as a matter of law where the destruction of property was the result of a valid exercise of police power. *See Lech v. Jackson*, 791 Fed. App'x. 711 (10th Cir. 2019); *Johnson v. Manitowoc Cnty.*, 635 F.3d 331 (7th Cir. 2011); *AmeriSource Corp. v. United States*, 525 F.3d 1149 (Fed. Cir. 2008).  The

most factually analogous to the case at bar is *Lech*.[5]

In *Lech*, officers from the city's police department responded to a burglar alarm at the Lech home and learned that an armed criminal suspect who was attempting to evade capture by the Aurora Police Department was inside the home.  791 Fed. App'x. at 713.  To prevent the suspect from escaping, the officers positioned their vehicles in the driveway as a barricade.  *Id.*  Negotiators attempted to convince the suspect to surrender.  *Id.*  After these efforts to negotiate proved unsuccessful, officers employed increasingly aggressive tactics: fired several rounds of gas munition into the home, breached the home's doors with a BearCat armored vehicle so they could send in a robot to deliver a "throw phone" to the suspect, and used explosives to create sight lines and points of entry to the home.  *Id.*  When these tactics failed, officers used the BearCat to open multiple holes in the home.  *Id.*  Officers were eventually successful in apprehending the suspect, but, as a result of the 19-hour standoff, the home was rendered uninhabitable.  *Id.*  The City offered to help with temporary living expenses when the Lech's demolished and rebuilt their home, but it otherwise denied liability for the incident and declined to provide any further compensation.  *Id.* The Tenth Circuit held the damage caused in the course of the arrest was not a taking for public use, but rather an exercise of the police power.  *Id.* at 717.  Though the Court recognizes the facts are substantially similar to what happened at the House, the Court nevertheless is not persuaded to follow the *Lech* decision for the reasons set forth below.

First, this Court is not bound by an unpublished opinion from a different circuit.

---

[5] For the same reasons the Court does not find *Lech* persuasive, *Johnson* and *Amerisource* similarly fail to sway the Court.  First, they too rely on dicta from *Bennis v. Michigan*, 516 U.S. 442 (1996).  *Johnson*, 635 F.3d at 336; *Amerisource*, 525 F.3d at 1154.  The Court discusses in much further detail below why *Bennis* is neither controlling nor persuasive here.  Second, these cases do not present the same factual issues as this case. *Johnson*, 635 F.3d at 332–33 (affirming decision not to compensate for government's seizure of personal items and minor damage to home incidental to a murder investigation); *Amerisource* 525 F.3d at 1150–51 (affirming no compensation for the government's seizure and retention of drugs past their expiration date while it investigated the pharmacy's principals).  Third, these decisions predate the unequivocal holding in *Cedar Point*.  141 S. Ct. 2063.

Second, and more importantly, *Lech*'s decision rests on an untenable analysis of police power and eminent domain.  The Tenth Circuit first held that in the police power context, there is no distinction between physical and regulatory takings, and any taking pursuant to a police power is categorically non-compensable.  *Id.* at 717.  Second, the Tenth Circuit decided that the destruction of the Lech's home was a valid exercise of the state's police power.  *Id.* at 718–19.  Accordingly, the Tenth Circuit denied the Lech's takings claim.  *Id.* at 719.  As to the first part of *Lech*'s holding, the Tenth Circuit relies on the Supreme Court's decisions in *Mugler v. Kansas*, 123 U.S. 623, 668 (1887), and *Bennis v. Michigan*, 516 U.S. 442 (1996).  As detailed below, the Court disagrees with the Tenth Circuit's reading of *Mugler* to eliminate any distinction between physical and regulatory takings.

### i.      *Lech* Conflates Physical and Regulatory Takings

The Tenth Circuit characterized *Mugler* as the first time the Supreme Court acknowledged a "hard line between those actions the government performs pursuant to its power of eminent domain and those it performs pursuant to its police power . . . in the context of regulatory takings." *Id.* (quoting *Mugler*, 123 U.S. at 668–69).  But the Supreme Court made no such distinction. Indeed, the *Lech* court improperly extended the Supreme Court's purported holding in *Mugler* to physical takings cases, rather than treating physical takings differently than their regulatory counterparts. *Id.*

It should first be noted that *Mugler* simply denied what would be characterized today as a regulatory takings claim.  123 U.S. at 667–68 (denying the Petitioner's case because it did not implicate as severe an intrusion with private property rights as the one in *Pumpelly v. Green Bay Co.*, 80 U.S. 166, 177 (1871)).  However, at the time *Mugler* was decided, a regulatory takings claim did not even exist. *Lucas v. S.C. Coastal Counsel*, 505 U.S. 1003, 1014 (1992) ("Prior to

14

Justice Holmes's exposition in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), it was generally thought that the Takings Clause reached only a direct appropriation of property . . . or the functional equivalent of a practical ouster of the owner's possession."). Yet, *Lech* ignored these important contextual details.

Second, in contrast to the Tenth Circuit's uniform application of *Mugler* to both physical and regulatory takings, the Supreme Court in *Mugler* actually emphasized that regulatory takings and physical takings *should* be treated differently. 123 U.S. at 667–68 (emphasis added). The Supreme Court noted that governmental entities have a broad police power to prohibit individuals from doing that which would be prejudicial to the health, the morals, or the safety of the public." *Id*. at 669. Stated simply, governmental entities have a broad power to regulate in the name of the public good. Indeed, the Supreme Court held when the government is acting for the public good, it should not be "burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community." *Id.*

This decision is prudent in the regulatory context where enactment of a rule or regulation by a state pursuant to its police powers is likely to have "tangential," "unanticipated," and unquantifiable effects on the private use of property. *Tahoe-Sierra*, 535 U.S. at 324. Moreover, these unquantifiable effects can often be justified by pointing to the benefit to the public good. *Id.* at 324. That is not the case in the context of physical takings. Emilio R. Longoria, *Lech's Mess with the Tenth Circuit: Why Governmental Entities Are Not Exempt from Paying Just Compensation When They Destroy Property Pursuant to Their Police Powers*, 11 WAKE FOREST J. L. & POL'Y 297, 311 (2021) (criticizing *Lech* and its implications). Physical invasions of property made pursuant to a state's police powers—Baker's case here—are "relatively rare, easily

identified, and usually represent a greater affront to individual property rights," *Tahoe-Sierra*, 535 U.S. at 324.  These physical invasions represent such a greater affront to individual property rights—as compared to regulatory takings—because they often involve an "unoffending property [being] taken away from an innocent owner" with few easily identifiable benefits in return.  *Mugler*, 123 U.S. at 669.  In such cases, the property owner should be compensated for forfeiting the property for a public use.

Ignoring these key differences, the Tenth Circuit uniformly applied *Mugler*'s distinction between "'the state's power of eminent domain'—under which 'property may not be taken for public use without compensation'—and state's 'police powers'—which are not 'burdened with the condition that the state must compensate [affected] individual owners for pecuniary losses they may sustain'" to both physical and regulatory takings.  *Lech*, 791 Fed. App'x at 715, 717 (quoting *Mugler*, 123 U.S. at 668–69).  If applied, the Tenth Circuit's interpretation of *Mugler* would work error in cases such as this one, where there is a physical invasion of private property, not a regulatory diminishment of value of property.  Compounding this error, the Tenth Circuit then pulled dicta from *Bennis* to bolster its distinction between a non-compensable police power claim and a compensable takings claim.

### ii.    *Lech* Improperly Relied on *Bennis v. Michigan*

*Bennis* involved a Michigan court order for the forfeiture of a car on public-nuisance grounds that was jointly owned by a husband and wife when the husband was caught in the car engaged in sexual activity with a prostitute.  516 U.S. at 443.  The wife argued that the forfeiture, as applied to her, was an unconstitutional taking, but the Court disagreed.  *Id.* at 452.  The Supreme Court stated, "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power

16

of eminent domain." *Id.* at 452.  The cases the City points to all relied on that statement when they decided a taking could not occur, even where the government completely destroyed private property.

In total, the segment of the *Bennis* opinion relating to the Fifth Amendment is three sentences long.  *Id*.  Those three sentences are more accurately described as dicta, as they were not central to the holding.  Emilio R. Longoria, *Lech's Mess*, 11 WAKE FOREST J. L. & POL'Y 297, 306 (2021).  Accordingly, the sentences in *Bennis* on takings claims are not binding on this Court or any subsequent court.  *Obiter dictum*, LEGAL INFO. INST., https://www.law.cornell.edu/wex/obiter_dictum (last visited April 27, 2022) (noting that dictum is not legally binding).

To begin, the Tenth Circuit's suggestion that this dicta about the Fifth Amendment "implicitly" supports a "distinction" between eminent domain cases and police powers cases in the context of "physical taking[s]," *Lech*, 791 Fed. App'x. 716, overstates the Supreme Court's holding.  As Justice Marshall explained in *Cohens v. Virginia*, a case's holding is treated with reverence because "[t]he question actually before the Court is investigated with care, and considered in its full extent."  19 U.S. 264, 399–400 (1821).  "Other principles which may serve to illustrate [a case's holding]," like dicta "are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."  *Id*.  This Court thus declines to accord as much weight to *Bennis* as the other circuits.  Second, drawing a brightline rule, as the court in *Lech* did and as the City now proposes, also ignores major concerns which guided the *Bennis* decision.

In explaining its holding in *Bennis*, the Supreme Court relied heavily on three Supreme Court forfeiture cases from the nineteenth and early twentieth centuries: *The Palmyra*, 25 U.S. 1

17

(1827); *Dobbins's Distillery v. United States*, 96 U.S. 395 (1877); and *Van Oster v. Kansas*, 272 U.S. 465 (1926)).   516 U.S. at 146–48.   In each of these cases, the Supreme Court upheld the uncompensated forfeiture of personal property used in committing a crime.  *See The Palmyra*, 25 U.S. at 17–18; *see also Dobbins's Distillery*, 96 U.S. at 401–02; *see also Van Oster*, 272 U.S. at 468.   However, the Supreme Court affirmed forfeiture without compensation for four specific reasons, which the court in *Lech* did not consider.

One reason was that the forfeited items presented a threat in and of themselves.  *The Palmyra*, 25 U.S. at 8 ("The brig Palmyra is an armed vessel, asserting herself to be a privateer, and acting under a commission of the King of Spain, issued by his authorized officer at the Island of Porto Rico."); *see also Dobbins's Distillery*, 96 U.S. at 396 ("[T]he real and personal property" seized was a distillery and the items necessary to run it, which was illegal at the time); *see also Van Oster*, 272 U.S. at 466 ("vehicle[] used in unlawful transportation of liquor").   Second, the forfeited property in each case was entrusted to the criminal perpetrators as part of the criminal enterprise.  *The Palmyra*, 25 U.S. at 13 (seizing property of the alleged pirates); *see also Dobbins's Distillery*, 96 U.S. at 396 (seizing real and personal property used to run the still belonged to the alleged criminals); *see also Van Oster*, 272 U.S. at 465–66 (seizing vehicle that owner entrusted to an associate who used it to illegally transport liquor).   Third, forfeiting the property achieved "punitive and remedial" goals.  *The Palmyra*, 25 U.S. at 15 (forfeiting the vessel served as punishment to the pirates); *see also Dobbins's Distillery*, 96 U.S. at 401–03 (forfeiting the still and its appurtenances served as punishment to the distillers); *see also Van Oster*, 272 U.S. at 465–66 (forfeiting the vehicle served as punishment to the alleged criminal).   Finally, the property in question was evidence in the subsequent criminal prosecutions.  *See The Palmyra*, 25 U.S. at 8 (the ship was evidence of privateering); *see also Dobbin's Distillery*, 96 U.S. at 396 (the site and

18

tools used to distill were evidence of the crime of illegal production of alcohol); *see also Van Oster*, 272 U.S. at 465–466 (the vehicle was evidence of the crime of illegal transportation of alcohol).

Thus, uncompensated forfeiture in those situations was therefore justified to serve certain policy goals, like the security of property, criminal deterrence, and punishment. Furthermore, *Bennis* emphasized the limits on the government's police power: that any uncompensated forfeiture be proportional to the health, safety, or welfare goals purportedly being achieved by a state. *Bennis*, 516 U.S. at 450–51. Imposing a brightline rule based on three sentences from an otherwise nuanced and detailed opinion would undermine ample Supreme Court caselaw and lead to inconsistent results. Yet that is what the Tenth Circuit did in *Lech*. Once the *Lech* court determined that physical appropriation through some power other than eminent domain is non-compensable, the court then turned to whether the officers destroyed the Lech home pursuant to the government's police power.

### iii.    *Lech* Failed to Consider Whether Government Action Taken Pursuant to Police Power Falls Within the Fifth Amendment's Public Use

The *Lech* court held that when law enforcement causes damage in the course of arresting a fugitive, it does so for the public good pursuant to its police power. 719 Fed. App'x at 718. The analysis ended there, without a determination of whether such action could also be for the public use and therefore within the eminent domain power.

The flaw in the Tenth Circuit's reasoning is that it focuses solely on the scope of the police power. *See* Zachary Hunter, *You Break It, You Buy It—Unless You Have a Badge? An Argument Against a Categorical Police Powers Exception to Just Compensation*, 82 OHIO ST. L.J. 695, 703 (2021). By ending its inquiry upon finding that the actions were taken pursuant to the state's police

powers, the *Lech* court impliedly asserted that the public good and public use categories are mutually exclusive.  719 Fed. App'x at 717 (relying on *Mugler*, 123 U.S. at 669).  An assertion that the categories are mutually exclusive, effectively, sets the outer limits of public use somewhere before public good.  Zachary Hunter, *You Break It, You Buy It*, 82 OHIO ST. L.J. 695, 703 (2021).  However, the Supreme Court has adopted a much broader understanding of public use.

*Kelo v. City of New London*, 545 U.S. 469 (2005), exemplifies the Supreme Court's broad understanding of "public use."  In *Kelo*, the city planned to take the plaintiffs' property and then redistribute it to a private pharmaceutical company.  *Id.* at 474–75 ("The NLDC intended the development plan to capitalize on the arrival of the Pfizer facility and the new commerce it was expected to attract.").  The city claimed that doing so was part of an economic development plan that would revitalize the "economically distressed city."  *Id* at 472.  The Supreme Court's majority opinion held that the city's actions fell within the scope of public use because the plan was designed to serve a "public purpose."  *Id.* at 484.  In that case, the Court equated public use with its "broader and more natural interpretation . . . as 'public purpose,'" a concept that is defined broadly and one that provides deference to legislative judgments.  *Id*. at 480.  This interpretation provides state governments with the ability to directly condemn properties under their power of eminent domain, so long as it will afford any appreciable benefits to the community's welfare—a concept within the purview of a state's police powers.  *Id*. at 483–85 (concluding, based on precedent, that the concept of public welfare is within public purpose and that appreciable benefits to the community serves such a purpose).

Similarly, over two decades earlier, the Supreme Court in *Hawaii Housing Authority v. Midkiff*, made explicit that "[t]he 'public use' requirement is . . . coterminous with the scope of a

sovereign's police powers."  467 U.S. 229, 240 (1984).  This holding meant that "whatever the state may legitimately achieve through its power to regulate property under the police power, it may instead choose to do through the power to take property through eminent domain."  JOSEPH WILLIAM SINGER, BETHANY R. BERGER, NESTOR M. DAVIDSON & EDUARDO MOISÉS PEÑALVER, Property Law: Rules, Policies, and Practices 1503 (Rachel E. Barkow et al. eds., 7th ed. 2017).

*Hawaii Housing* relied on principles derived in *Berman v. Parker*.  467 U.S. at 239.  In *Berman*, the Supreme Court noted that to assess whether an act serves a public purpose, it deals with "what traditionally has been known as the police power."  *Berman*, 348 U.S. at 26.  Once such act is within that authority, the right to realize it through the exercise of eminent domain is clear.  *Id*. at 33.  Thus, the Supreme Court has made clear, since 1954, that the phrase "public use" is to be interpreted expansively and in a manner that is coterminous with a state's police power.  *Haw. Housing*, 467 at U.S. 240 (citing *Berman*, 348 U.S. at 33).  This interpretation allows the government to take properties in a wide variety of circumstances.  *See Kelo*, 545 U.S. at 472–81.  Thus, the narrow holding in *Lech* that support's the City's position is incongruent with Supreme Court precedent.  Furthermore, when the implications of both a narrow and broad definition of public use are combined, the ramifications have the potential to undermine takings law altogether.  Particularly in a case such as this one.

"If government was exempt from paying just compensation every time it exercised the police power, there would never be just compensation; the exception would swallow the rule."  J.P. Burleigh, *Just Compensation and the Police Power*, U. CIN. L. REV. (Apr. 8, 2020), https://uclawreview.org/2020/04/08/just-compensation-and-the-police-power/.   Consider the following scenario: A state decides that it would like to directly condemn a piece of private property.  Given the Supreme Court's expansive definition of public use, the state can directly

21

condemn the property so long as they cite to a purpose that falls within its police powers, as such powers are coterminous with public use.  Zachary Hunter, *You Break It, You Buy It*, 82 Ohio St. L.J. 695, 706 (2021).  This will allow the state to satisfy the Fifth Amendment's public use requirement.  *Id*.  Nevertheless, in the same case, the state can also claim that they are immunized from takings liability, as under the categorical police powers exception, it is not required to provide just compensation.  Thus, the private landowner is left with a scenario where it both loses its property and receives nothing in return, given the conflicting definitions of "public use."  Not only is such a result fundamentally unfair, but it is also inconsistent with the Supreme Court's Takings Clause jurisprudence.

"This prohibition against ad hoc inquiries into whether a government's use of its police powers effected a taking will create a fundamental shift in how we interpret the Takings Clause." Emilio R. Longoria, *Lech's Mess*, 11 WAKE FOREST J. L. & POL'Y 297, 322 (2021).  Consider what would have happened had the brightline holdings the City relies on in *Amerisource*, *Johnson*, and *Lech* applied to various historic Supreme Court cases, using *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951), as an example.  In *Pewee*, the United States used its police powers to take over operations of a coal mine whose workers had recently gone on strike.  *Id*. at 114.  The government argued that had it not taken action, the strikes might have curtailed coal production, thus impacting other war industries dependent on the mines.  *Id*. at 115–16. Although the government's operation of these private mines was clearly authorized under the government's police powers, the Supreme Court nevertheless held that these actions effected a taking.  *Id*.  But, according to the City, the Supreme Court was wrong.

More importantly, were this rule applied here, Baker's constitutional protections under the Fifth Amendment would disappear.  It cannot be the case that public good could be done at the

cost of the individual.  When the Court reads the decisions in *Lech*, *Johnson*, and *Amerisource*, the Court is left with one question: "What is more terrifying: the fact that the government would have to pay a just amount for the property it destroys pursuant to its police powers, or that it would be exempt from paying a dime, regardless of the motivations behind its actions?"  Emilio R. Longoria, *Lech's Mess*, 11 WAKE FOREST J. L. & POL'Y 297, 306 (2021).

The brightline rule the City advocates for undermines the Supreme Court's characterization of its own caselaw as "provid[ing] no support" for an approach that would "essentially nullify . . . limits to the noncompensable exercise of the police power." *Lucas*, 505 U.S. at 1026; *see also First Eng. Evangelical Lutheran Church of Glendale v. Cnty. of L.A.*, 482 U.S. 304, 315 (1987) ("[G]overnment action that works a taking of property rights necessarily implicates the constitutional obligation to pay just compensation.") (internal quotations omitted).

### 3.  Conclusion

The Supreme Court has repeatedly stated that the Takings Clause prevents the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"  *Penn Central*, 438 U.S. at 123 (quoting *Armstrong*, 364 U.S. at 49).  The Supreme Court has also articulated a *per se* rule that applies here: in the case of physical appropriations by the government, the government must pay for what it takes.  *Cedar Point*, 141 S. Ct. at 2071.  The Court is not persuaded to deviate from physical takings jurisprudence "as old as the Republic," *Tahoe-Sierra*, 535 U. S. at 322, especially considering the decisions the City relies on cherry-picks dicta from *Bennis* to produce a rule that undermines decades of Supreme Court Takings precedent.  Thus, the Court does not find that the total destruction of private property pursuant to the government's exercise of its police power is categorically non-compensable under the Fifth Amendment.  Rather, as the Supreme Court makes

23

clear, takings claims typically turn on fact-specific inquiries.  *See Penn Cent.*, 438 U.S. at 124.

### B.  Takings Clause Analysis

"[A] [t]akings [c]lause violation has two necessary elements. First, the government must take the property. Second, it must deny the property owner just compensation." *Knick*, 139 S. Ct. at 2181 (Kagan, J., dissenting) (citing *Horne v. Dep't of Agric.*, 569 U.S. 513, 525–26 (2013)). But "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense"; difficulty exists in "trying to draw the line between what destructions of property by lawful governmental actions are compensable 'takings' and what destructions are 'consequential' and therefore not compensable." *Armstrong*, 364 U.S. at 48 (collecting cases).  Here, no one contests the lawfulness of the officers' actions.  The issue is the nature of the invasion.  *See Cress*, 243 U.S. at 328 ("[I]t is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking.").

As a starting point, damage resulting from government action does not constitute a taking if it is "strictly consequential" or incidental to the government's action.  *Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 593–94 (1906) ("If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution.").  In *Bedford v. United States*, the Supreme Court affirmed the decision of the lower court denying compensation.  192 U.S. 217, 225 (1904).  There, riparian landowners on the Mississippi River sued the United States for the erosion and flooding of their lands allegedly caused by government works upriver.  *Id.* at 223.  The work consisted of a revetment built along one bank of the river, which did not change the course of the river but operated only to maintain

24

the current course of the river. *Id*. If the revetment had not been built, the river would have continued to widen toward the Louisiana bank of the river. *Id*. The Supreme Court reasoned: "In the case at bar the damage was strictly consequential. It was the result of the action of the river through a course of years." *Id.* at 225.

By contrast, in *United States v. Causby*, the Court found that frequent overflights by low-flying United States military aircraft resulted in a taking because the flights deprived the property owner of the customary use of his property as a chicken farm. 328 U.S. 256, 266 (1946). The Court emphasized: "[T]he damages were not merely consequential. They were the product of a direct invasion of respondents' domain." *Id*. Similarly, in *Cress*, the government raised the water of the Cumberland river above its natural level through the operation of a lock and dam, so that lands not normally invaded were subjected permanently to frequent overflows. 243 U.S. at 318. This action reduced the property value in half. *Id*. The findings made it plain that it was not a case of temporary overflow or of consequential injury but a condition of "permanent liability to intermittent but inevitably recurring overflows" and it was held that such overflowing was a direct invasion, amounting to a taking. *Id.* at 328.

In a similar vein to the determination of whether damage to property is a direct result of government action, another key consideration to the takings inquiry "is the degree to which the invasion is intended or is the foreseeable result of authorized government action." *Ark. Game and Fish*, 568 U.S. at 39 (citing *John Horstmann Co. v. United* States, 257 U.S. 138, 146 (1921)). *Horstmann* involved the government's diversion of water from one watershed to another, resulting in a general increase in ground water level and a 19-foot increase in two lakes (whose water levels had not fluctuated more than two feet in 29 years). 257 U.S. at 142–43. The plaintiffs claimed that this flooding and groundwater-level increase destroyed the value of their property. *Id.* at 143. The

25

Supreme Court denied just compensation because it determined that the government could not have foreseen the plaintiff's subsequent alleged loss. *Id*. at 146–47.

*Keokuk & Hamilton Bridge Co. v. United States*, 260 U.S. 125 (1922), provides another example of damage to property that does not amount to a taking because it was neither intentional nor foreseeable. There, the government blasted the bed of a stream on the side of a privately-owned pier, causing portions of the pier to break off and fall into the water. *Id*. at 126. Justice Holmes, writing for the Supreme Court, stated that there might have been a taking if the government had deliberately inflicted the damage to property. *Id*. at 126. However, "this [was] an ordinary case of incidental damage which if inflicted by a private individual might be a tort but which could be nothing else. In such cases there is no remedy against the United States." *Id*. at 127.

The Court also finds *Sanguinetti v. United States*, 264 U.S. 146 (1924) instructive here. In *Sanguinetti*, the government constructed a canal to connect a slough and a river. 264 U.S. at 146. The claimant's land was positioned between the slough and the river above the canal. *Id*. The year after the canal's construction, a "flood of unprecedented severity" caused the canal to overflow onto the claimant's land; less severe flooding and overflow occurred in later years. *Id.* at 147. The Court held there was no taking. *Id.* at 149. "This outcome rested on settled principles of foreseeability and causation." *Ark. & Game*, 568 U.S. at 34. The Court emphasized that the Government did not intend to flood the land or have "any reason to expect that such [a] result would follow" from construction of the canal. *Sanguinetti*, 264 U.S. at 148. "It was not shown that the overflow was the direct or necessary result of the structure; nor that it was within the contemplation of or reasonably to be anticipated by the Government." *Id*. at 149–50.

Accordingly, the principles derived from these cases guide the Court's decision in

26

determining the nature of the Department's invasion.  *See Cress*, 243 U.S. at 328.  As such, if the destruction of the House was a direct result of the government's conduct, and that result was intentional or foreseeable, then the Department's conduct amounts to a taking.   such conduct intentionally or foreseeably caused the destruction.  Further, having already determined the police power and eminent domain power may co-exist, the Court finds helpful the Fourth Circuit's decision in *Yawn v. Dorchester County*, which demonstrates how this inquiry functions in the police power context.  1 F.4th 191 (2021).

In *Yawn*, the local government planned an aerial mosquito-spraying operation, prior to which the government "issued a press release . . . to numerous media outlets, including local television stations, newspapers, radio stations, and social media platforms" informing citizens of the plans and warning they take precautionary measures.  *Id.* at 193.  The pilot undertaking the operation had a map of all known beehives in the area "to determine when to turn off the sprayer during the flight" in an effort to avoid the bees.  *Id.*  Identical mitigation efforts had been previously successful—but this time, the communication efforts did not reach two of the beekeepers.  *Id.* When the pesticide spray killed a number of these keepers' bees, the keepers brought suit alleging a Fifth Amendment taking.  The Fourth Circuit analyzed whether the death of the appellants' bees was the intended or foreseeable result of the aerial pesticide spray—and ultimately concluded it was not.  For one, the government had issued a press release warning citizens to take precautionary measures.  *Id.* at 195–96.  Additionally, the government itself took measures to avoid spraying the pesticide over areas marked as beehive zones.  *Id.* at 196.  Because these efforts had previously worked, it was not foreseeable that they would fall short on this particular occasion.  *Id.*

Turning now to the case at bar, the Court finds in this case that the destruction to Baker's home was intentional and foreseeable.  Baker provided an abundance of evidence establishing that

Department officers, among other things: (1) stormed the House; (2) broke windows; (3) knocked down the garage door; (4) knocked down the backyard fence; and (5) fired dozens of explosive tear gas cannisters into the home.  Such actions were intentional, even if the Department's motives were to secure a threat to public safety.[6]  The City itself indicates "the [Department] dr[ew] up plans" before busting into Baker's home to apprehend Little (Dkt. #6 at p. 22).  As Baker notes, "if for some reason the [H]ouse did not sustain damage . . . then the [Department's] plan necessarily would have failed" (Dkt. #9 at p. 12).  The resulting damage, therefore, can hardly be considered "incidental consequence[s] of the City's actions" (Dkt. #6 at p. 27).  Like *Causby*, the damage to the House was "the product of a direct invasion" of Baker's domain.  328 U.S. at 266.

Even if the government did not intend to damage Baker's property, it was foreseeable that such damage would result when Department officers stormed the House, broke windows, knocked down the garage door, rammed down the backyard fence with a tank-like vehicle, and fired dozens of explosive tear gas cannisters into the home without a degree of certainty that such actions would cause damage to the property.  *See Chicago B. & Q.*, 200 U.S. at 593–94.  In *Bedford*, the object of the construction was to prevent the navigable channel of the river from receding farther from the city located on the opposite bank from the land at issue.  192 U.S. at 218.  The government was blasting the riverbed in *Keokuk* to deepen the river channel to permit the passage of vessels.  260 U.S. at 126.  Finally, in *Sanguinetti*, government engineers constructed a canal below the landowner's property to help carry away water, but after floods of unprecedented severity, the capacity of the canal proved to be insufficient and overflowed onto the landowner's property.  264

---

[6] It is crucial to this analysis that intention not be conflated with motive.  One can intend a specific action but have varying degrees of motive.  Homicide in criminal law provides an example.  One can intend to shoot someone for a number of reasons, including to exact unlawful revenge or to lawfully defend oneself.  Both are intentional, but the motives differ drastically.  Similarly, in the context of intentional torts, the tort of battery does not require an intent to injure.  Rather, one must merely intend an offensive touching.  Here, the relevant inquiry is whether the destruction of the House was intentional and foreseeable—not whether the motive of the Department's officers was to destroy the House.

28

U.S. at 147.  The overflow was the result of the flood, not the canal itself.  *Id.*  In contrast to these examples, the object of the destruction of the House was the apprehension of Little, and such destruction was a direct result of the officers' actions.

Thus, the first element of a takings clause violation has been established.  *Knick*, 139 S. Ct. at 2181.  The government took Baker's property through the total destruction of the House in its pursuit to apprehend an armed fugitive.

The government must also deny the property owner just compensation in order to succeed on a takings claim.  *Knick*, 139 S. Ct. at 2181.  No one denies the City denied Baker any compensation—let alone *just* compensation.  Therefore, the second prong is met.  *Id.*  Baker has sufficiently established that the City took her property without just compensation in violation of the Fifth Amendment.  The City has not shown that there is a genuine issue of material fact that would affect a finding of liability.  Therefore, the City is liable under the Fifth Amendment as a matter of law.  The Court will next dispose of the City's remaining argument on Baker's takings claim.

### C.  Section 1983

Generally, a plaintiff seeking to establish liability under § 1983 must show that: (1) an official policy or custom, (2) promulgated by the municipal policymaker, (3) was the moving force behind the violation of a constitutional right.  *Piotrowski v. City of Hous.,* 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978) (requiring a plaintiff to show that a protected right was violated by the execution of the municipality's policy or custom in order to establish § 1983 liability against the municipality)); *see also Culbertson v. Lykes*, 790 F.3d 608, 628 (5th Cir. 2015).  The City argues Baker cannot establish municipal liability under § 1983.  Indeed, Baker's motion does not even mention these § 1983 requirements.  However, in

Baker's complaint, she brings her Fifth Amendment claim under both 28 U.S.C. § 1983 and the Fifth Amendment itself (Dkt. #1 ¶ 36).  Baker's partial motion for summary judgment asks the Court to determine whether the City is liable under the Fifth Amendment *only* (Dkt. #19 at p. 2). Thus, § 1983 and the *Monell* doctrine are not relevant at this stage.  Moreover, Baker does not need § 1983 to proceed with her Takings Clause claim.

Baker has previously cited the Court to case law highlighting the "self-executing character" of the Fifth Amendment right to just compensation.  *See* (Dkt. #1 ¶ 36; Dkt. #9 at p. 19 (quoting *First Eng.*, 482 U.S. at 315).  This argument has merit.  If the Fifth Amendment is "self-executing" as Supreme Court jurisprudence suggests, it would seem a plaintiff could recover monetary damages without the § 1983 vessel when a plaintiff brings a Fifth Amendment takings clause claim.  In *First English*, the Supreme Court indicated that "a Fifth Amendment takings claim is self-executing and grounded in the Constitution, such that additional [s]tatutory recognition [is] not necessary."  482 U.S. at 315 (quoting *Jacobs v. United States*, 290 U.S. 13, 16 (1933) (internal quotation marks omitted)); *see also United States v. Dickinson*, 331 U.S. 745, 748 (1947). Additionally, "[i]f there is a taking, the claim is 'founded upon the Constitution,'" *Causby*, 328 U.S. at 267, and "'the act of taking' is the 'event which gives rise to the claim for compensation.'" *Knick*, 139 S. Ct. at 2170 (quoting *United States v. Dow*, 357 U.S. 17, 22 (1958)).  At bottom, "the [Supreme] Court has frequently repeated the view that, in the event of a taking, the compensation remedy is required by the Constitution."  *First Eng.*, 482 U.S. at 316 (citing *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5 (1984)); *Causby*, 328 U.S. at 267; *Seaboard Air Line R. Co. v. United States*, 261 U.S. 299, 304–06 (1923).

Accordingly, the Court holds that, because the Fifth Amendment is self-executing, Baker's

claim under the Fifth Amendment Takings Clause is not dependent upon the § 1983 vessel.[7] Accordingly, the Court need not determine whether Baker established an official policy under *Monell.* The Court will now turn to Baker's Texas Takings Clause claim.

### III.    Article I, Section 17 of the Texas Constitution

In addition to her Fifth Amendment claim, Baker also seeks a finding of liability under the Texas Constitution. "The Texas Constitution provides that '[n]o person's property shall be *taken, damaged* or *destroyed* for or *applied* to public use without adequate compensation being made." *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex. 2004) (quoting TEX. CONST. art. 1, § 17) (emphasis added). By contrast, the Fifth Amendment provides in pertinent part: "nor shall private property be *taken* for public use, without just compensation." U.S. CONST. amend. V (emphasis added). Thus, the Texas Constitution's Takings Clause differs from the Takings Clause set forth in the United States Constitution.

That said, the Texas Supreme Court has described Article I, Section 17 of the Texas Constitution as "comparable" to the Takings Clause of the United States Constitution. *Hallco Tex., Inc. v. McMullen Cnty.*, 221 S.W.3d 50, 56 (Tex. 2006). In addition, the Texas Supreme

---

[7] Legal scholarship supports this holding as well:

> The modern development of § 1983 has obscured the fact that the federal question statute was once the preferred vehicle for enforcing constitutional limits on state and local governmental action. . . . This question is of particular concern in light of the resurgence of litigation to enforce what may loosely be called "economic" rights under the commerce, contract, takings, supremacy, and interstate privileges and immunities clauses. It is at least arguable that § 1983 was not intended to cover these rights, despite its express reference to "any rights, privileges, or immunities secured by the Constitution." Before the modern revival of § 1983, and in the absence of diversity, many such "economic" rights would have been actionable in federal court under section 1331 only.

Michael G. Collins, *'Economic Rights,' Implied Constitutional Actions, and the Scope of Section 1983*, 77 GEO. L.J. 1493, 1495 (1989); *see also Damage Remedies Against Municipalities for Constitutional Violations*, 89 HARV. L. REV. 922, 960 (1976) ("The taking cases may be rationalized on the ground that the [F]ifth [A]mendment's prohibition of taking of property without 'just compensation' is *sui generis* among constitutional rights in that it explicitly provides for a monetary remedy.") (citing *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 409 F.2d 718, 723 (2d Cir. 1969), *rev'd*, 403 U.S. 388 (1971); *Jacobs*, 290 U.S. at 16)).

Court has characterized caselaw on takings under Article I, Section 17 as "consistent with federal jurisprudence." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex. 2012). Even so, the Texas Supreme Court has also recognized that the Texas Takings Clause provides broader protection in certain areas. *See Steele v. City of Hous.*, 603 S.W.2d 786, 789–91 (Tex. 1980) ("The underlying basis for compensating one whose property is taken or damaged or destroyed for public use may . . . be the same . . . . But the terms have a scope of operation that is different."). In fact, the Fifth Circuit understands Section 17 to "confer[] upon property owners greater rights of recovery against the government than its federal [F]ifth [A]mendment counterpart." *Palacios*, 888 F.2d at 1513.

Despite Section 17's apparent broad application, the Texas Takings Clause applies only to *intentional*, not *negligent*, damage. *See Hale*, 146 S.W.2d at 737; *Steele*, 603 S.W.2d at 790–91. A plaintiff seeking recovery for a taking under Texas law must prove the government "intentionally took or damaged their property for public use, or was substantially certain that would be the result." *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005)). As such, "a taking cannot be established by proof of mere negligent conduct by the government." *Id.* (citation omitted). Rather, "the requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 555 (Tex. 2004) (citing *Brazos River Auth. v. City of Graham*, 354 S.W.2d 99 (Tex. 1961)). Importantly, "[o]nly affirmative conduct by the government will support a takings claim." *Kerr*, 499 S.W.3d at 799.

The City argues that Baker's claim under Texas law fails "because it is a sheer attempt to

32

allege tort recovery in a claim wearing takings claim clothing" (Dkt. #6 at p. 23).[8]  Baker responds that she has not alleged a claim for negligence (Dkt. #19 at p. 16).  The Court agrees.

While negligence cannot serve as the basis for a takings claim under the Texas Constitution, the Court has already determined that the Department's destruction of the House was intentional and foreseeable.[9]   Again, the Department officers planned to, and actually did: (1) storm the House; (2) break windows; (3) knock down the garage door; (4) knock down the backyard fence; and (5) fire dozens of explosive tear gas cannisters into the home.  Such actions were intentional, even if the City's motives were to secure a threat to public safety.  Even if the government did not *intend* to damage Baker's property to apprehend Little, the City was substantially certain such damage would result.  *Gragg*, 151 S.W.3d at 555.  It is unreasonable for the City to suggest the Department officers stormed Baker's House, broke the windows, knocked down the garage door, rammed down the backyard fence with a tank-like vehicle, and fired dozens of explosive tear gas cannisters into the home without a degree of certainty that such actions would cause damage to the property.

Lastly, Baker has established that the City took her property for a public use: apprehension of a dangerous fugitive whose freedom threatened the public.  *See Steele*, 603 S.W.2d at 792 ("That the destruction was done for the public use is or can be established by proof that the City ordered the destruction of the property because of real or supposed public emergency to apprehend armed and dangerous men who had taken refuge in the house.").  Baker has sufficiently established a takings claim under the Texas Constitution.  Thus, the City is liable under Article I, Section 17 of the Texas Constitution for refusing to compensate Baker for the damage it caused her home as a matter of law.

---

[8] The City does not specify the type of tort it believes Baker has attempted to bring.
[9] *See supra* pp. 24–28.

33

## CONCLUSION

It is therefore **ORDERED** that Plaintiff Vicki Baker's Motion for Partial Summary Judgment (Dkt. #19) is **GRANTED**.  The Court finds the City liable for a taking under both the Fifth Amendment of the United States Constitution, made binding on the States through the Fourteenth Amendment, and Article I, Section 17 of the Texas Constitution.

**IT IS SO ORDERED.**

**SIGNED this 29th day of April, 2022.**

_____

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

34